# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

KELLY J. TURA,      :
           :
    Plaintiff,    :
           :
   v.       :   CIVIL ACTION NO.
           :   1:07-CV-0379-JOF
THE WHITE OAK GROUP, INC., :
           :
    Defendant.   :

## OPINION AND ORDER

  This matter is before the court on Plaintiff's motion for leave to file under seal [45]; Plaintiff's motion for summary judgment [46]; Defendant's motion for summary judgment on Plaintiff's claims [47]; Defendant's motion for summary judgment on its counterclaims [48]; Defendant's motion to seal [49]; Defendant's motion to seal [52]; Defendant's motion for leave to manually file confidential documents under seal [54]; Defendant's motion to seal [55]; Plaintiff's amended motion for summary judgment [60]; Plaintiff's motion to seal [63]; Plaintiff's motion to seal [69]; Defendant's amended motion to seal [73]; Defendant's motion for leave to file documents under seal [77]; and Plaintiff's motion for oral argument [79].

## I.    Background

### A.    Procedural History and Facts

Plaintiff, Kelly Tura, filed suit against Defendant, The White Oak Group, on February 13, 2007, alleging breach of contract arising out of a Consulting Agreement she signed with The White Oak Group.  Defendant filed counterclaims against Plaintiff for causes of action of breach of contract, fraud, and unjust enrichment.  Both parties seek attorney's fees pursuant to O.C.G.A. § 13-6-11.

The White Oak Group is a private investment firm founded in 2002 that provides financial and management resources to various portfolio companies.  Christopher Melton and Mark Mykityshyn are the Managing Partners and sole shareholders of The White Oak Group.  During the relevant time frame, Reed Macdonald and Morgan McClure also worked at The White Oak Group as principals although they did not own any portion of the company.  The White Oak Group works generally in the aerospace and defense industry.  When it acquires a company, The White Oak Group usually brings in its own candidates to fill the positions of Chief Executive Officer and Chief Financial Officer.  Prior to acquiring a company, The White Oak Group also engages in a period of due diligence which can last between 90 and 120 days.  One person is designated as "lead" for the due diligence project, and all others in the office provide support to the lead.

2

During the second quarter of 2006, The White Oak Group was conducting due diligence on a firm that it planned to acquire. As part of that process, The White Oak Group asked the executive search firm of Boyden to assist it in its search to find a Chief Financial Officer to place in the firm once it was acquired. Boyden identified Plaintiff as a candidate for the position. On April 19, 2006, Plaintiff met with Mr. Melton, Mr. Mykityshyn, Mr. McClure, and Wilson Lowery, an individual associated with The White Oak Group, who was expected to be placed as the Chairman and Chief Executive Officer of the acquired company. Plaintiff met again with Mr. Mykityshyn and Roger Baker, who was expected to be Chief Operating Officer, on April 21, 2006. Finally, Plaintiff met with Mr. Melton and Mr. Mykityshyn on May 10, 2006. Mr. Lowery and Mr. Baker were present at that meeting to be introduced to representatives of GTCR and Guggenheim Capital Partners, LLC, which are entities that provide investment funding for The White Oak Group's acquisition activities. The White Oak Group extended an offer to Plaintiff to enter into a consulting arrangement with it shortly after this meeting.

The parties exchanged a series of e-mails between May 14 and May 19, 2006, discussing the terms of the contract. Plaintiff wrote to her contact affiliated with The White Oak Group that:

> As we have not yet entered into permanent employment arrangement, I have taken the salary, bonus, and benefit numbers initially offered and divided the total by twelve months to arrive at a monthly consulting fee of

3

$26,000 plus reasonable reimbursement expenses. I have not added in a premium for this being a short-term contract.

I would also like to have a six month rolling term agreement. I am assuming that in accepting the consulting agreement that the White Oak Group will honor the $200,000 base salary, the $75,000 bonus potential, and the 3/4% equity interest in the company or new companies that we acquire.

My assumption is that on accepting this agreement, we will continue to work towards a permanent employment arrangement.

*See* Tura Depo., Exh. 6, e-mail dated Mary 14, 2006. More exchanges took place and on May 19, 2006, Mr. Melton sent to Plaintiff a copy of the agreements that had been drafted by White Oak's attorney using the instructions of the parties and including Plaintiff's specific revisions. *Id.*, Exh. 7, e-mail dated May 19, 2006; *see also* Plaintiff's Depo., at 72-76.

The Consulting Agreement signed by the parties on May 19, 2006, contains the following relevant paragraphs:

1. <u>Services to be Provided</u>. Consultant agrees to provide no less than 40 hours per week working with the Company on its strategic initiatives, acquisitions, business planning, financial analysis, and any other activities as reasonably requested by the Company.

*See* Agreement, ¶ 1.

2. <u>Term and Termination</u>. This Agreement shall be for a term of 6 months from the Effective Date, and shall be extended automatically (without further action of the Company or Consultant) each day for an additional day so that the remaining term shall continue to be 6 months; <u>provided</u>, <u>however</u>, that either party may at any time, by written notice to the other, fix the term of this agreement to a finite

4

> term of the 6 months, without further automatic extension, commencing with the date of such notice.

*Id.*, ¶ 2 (underlining in original).

> 3. <u>Compensation</u>. The Company shall pay Consultant a fee hereunder of $26,000 per month payable in arrears on the first day of the following month. . . .

*Id.*, ¶ 3.

> 4. <u>Full-Time Employment</u>. It is the intention of the parties that Consultant become a full time employee and CFO for enterprises which the Company expects to acquire in the future. Upon the completion of any acquisition of a company, Consultant shall be engaged on a full-time basis on the following terms: (a) annual base salary of $200,000, (b) an annual performance bonus of up to $75,000 based on performance criteria to be established, (c) an option grant at fair market value for 0.75% of the equity of the enterprise on the date of hire . . . .

*Id.*, ¶ 4. The effective date of the contract was set at June 1, 2006.

By July 2006, the deal for acquiring the company fell through. The parties intended that Plaintiff would be placed as a Chief Financial Officer at a different company that White Oak Group would acquire. In the meantime, Plaintiff continued to do consultant work for The White Oak Group.

The White Oak Group conducts team meetings in its offices in Atlanta, Georgia each Monday. While there is no written requirement to attend these meetings, all members of the team including the managing partners, principals, administrative assistants and other employees participate in the meetings whether by phone or in person. No minutes of the

5

meetings or attendance records are kept. In June 2006, Mr. Melton requested that Plaintiff fly to Atlanta each week to attend the Monday morning team meetings. Plaintiff remained otherwise based out of her home in Maryland.

In October 2006 while working on due diligence for another potential acquisition, Mr. McClure and Mr. Macdonald expressed concerns about Plaintiff's substantive knowledge. They believed that Plaintiff could not understand how to perform a working capital analysis. *See* McClure Decl., ¶ 6. Plaintiff disagrees with this opinion and testified that she understood how to do a working capital analysis and only asked questions concerning the proprietary software that The White Oak Group used to conduct this analysis. There is no dispute, however, that Mr. McClure raised these concerns with Mr. Melton in October 2006. *Id.*, ¶ 7. Mr. Melton asked Mr. McClure to watch Plaintiff's performance in the next due diligence project to see whether similar concerns arose. *Id.*

In November 2006, Plaintiff began working due diligence on another potential acquisition company, termed by The White Oak Group as Project Vector. Mr. McClure was designated as the "lead" on the due diligence, although Plaintiff testified that she did not know of his precise role until a telephone conversation with Mr. Melton at the end of November 2006. From White Oak's perspective, all other members of the team were to support the lead during the due diligence process and assist him with projects as he requested. *See* McClure Decl., ¶ 8. Although the parties disagree as to the cause, there is

no dispute that Plaintiff and Mr. McClure did not get along during this process. The court does not need to engage in a he-said-she-said recounting of the particulars, but it is clear from the record that Mr. McClure did not believe that Plaintiff was assisting him in the process, and Plaintiff did not believe that Mr. McClure had the maturity or experience to use her talents in the most efficient manner. Mr. McClure told Mr. Melton of his problems with Plaintiff in late November 2006. At the same time, Plaintiff desired to speak with Mr. Melton of her problems with Mr. McClure. In particular, Plaintiff was distressed when she and Mr. McClure were calling in remotely to the Monday morning meeting from Project Vector's headquarters and part-way through the meeting, Mr. McClure picked up the telephone receiver so that she could no longer hear the meeting.

After trading phone mails, she and Mr. Melton spoke on November 28, 2006. Not surprisingly, the two have differing recollections of the conversation. Mr. Melton testified that he told Plaintiff he had concerns about her participation in the Project Vector due diligence and with the working capital analysis. He had hoped that Plaintiff would want to address these concerns and work on them, but he found that her response was defensive and critical of the manner in which The White Oak Group conducted due diligence as well as the age and experience of Mr. McClure. Plaintiff recalls that Mr. Melton never raised with her any problems with past performance, and the discussion focused on Project Vector. She

AO 72A
(Rev.8/82)

felt it was a productive conversation because she got "clarity" on the due diligence process. She stated she was not defensive during the conversation.

The parties' misunderstandings continued after this phone call, and the relationship between Plaintiff and Mr. McClure deteriorated further in December 2006. Plaintiff testified that Mr. McClure told her in early December to stop coming to the Monday morning team meetings. *See* Tura Depo., at 90. She also stated that no one from The White Oak Group questioned her absence from the meetings until she was terminated on January 10, 2007. Mr. McClure testified that he "did not instruct Ms. Tura to stop attending those meetings, nor did I indicate to her that it would be acceptable for her not to participate in those meetings. To the contrary, it was well-known that all members of the [White Oak Group] team were expected to participate in those meeting[s], whether in-person or by telephone." *See* McClure Decl., ¶ 13.

Mr. McClure testified that Plaintiff became "increasingly negative" during December and was "rude" and "openly critical" of his work. *See* McClure Decl., ¶ 14. Although Plaintiff was to be working out of Project Vector's offices, she often would not show up for work until 10:00 a.m. and would leave before 4:00 p.m. *Id.*, ¶ 15. She only produced three Excel spreadsheets for him during December 2006 and early January 2007. *Id.*, ¶ 16. "Given her physical absence from [Project Venture's] offices combined with the minimal work product she completed, there simply is no way that Ms. Tura could have been working

8

forty (40) hours per week on behalf of the [White Oak Group] during the months of December 2006 and January 2007." *Id.*, ¶ 17. Plaintiff, in contrast, testified that Mr. McClure asked her not to be at Project Vector's offices because the key personnel were trying to get work out for other members of the due diligence team. *See* Tura Depo., at 124-25. She worked out of her home at these times. *Id.*

Based on the problems as they perceived them, Mr. Melton and Mr. Mykityshyn decided in early January 2007 that they needed to terminate Plaintiff. On January 9, 2007, Plaintiff and Mr. Mykityshyn met at Project Vector's offices. Plaintiff testified that Mr. Mykityshyn told her at the meeting that she did not seem to be happy with the situation at The White Oak Group and that he would talk with Mr. Melton and they would all meet the following day. Despite this statement, Plaintiff never believed she was going to be terminated. Plaintiff, Mr. Melton, and Mr. Mykityshyn met on January 10, 2007, in a cafeteria at Project Vector's offices. Mr. Melton told her she was being terminated immediately because she failed to improve her job performance after the November 28, 2006 phone call. Plaintiff says her performance was never mentioned at this conversation. Rather, Mr. Melton simply told her she was not a "good fit" with the company.

On January 11, 2007, Plaintiff sent an e-mail to Mr. Melton and Mr. Mykityshyn in which she stated, "[b]ased on our conversation yesterday and per paragraph 2 of our consulting agreement, I understand that you wish to fix the duration of our agreement for

a period of six months, effective January 12, 2007." *See* Tura Depo., Exh. 22. Mr. Melton responded in a letter the same day which stated that the company terminated the Consulting Agreement effective immediately. "Your e-mail of this morning indicated that you misunderstood our conversation yesterday. White Oak does not propose to negotiate with you an extension of the term of the Consulting Agreement. As set forth above, your relationship with the Company and the Consulting Agreement are hereby terminated immediately, and your services are no longer required by the Company." *See id.*, Exh. 23.

During the January 10, 2007, conversation, Mr. Melton told Plaintiff to bill The White Oak Group for any money she felt she was owed. Plaintiff had previously submitted invoices for $26,000 for the months of June 2006 through November 2006, and those invoices had been paid without question by The White Oak Group. After her termination, Plaintiff submitted invoices for $26,000 for each of December 2006 and January 2007. The invoice for December 2006 states, "For December Services Rendered" and lists an amount of $26,000. The invoice for January 2007 states, "For January Services per our Consulting Agreement" and lists an amount of $26,000. *See id.*, Exh. 36.

On January 24, 2007, Mr. Melton sent an e-mail to Plaintiff stating that the company would not pay her for December 2006 until she signed a release. Plaintiff secured the services of an attorney, and in February 2007, the company paid Plaintiff $26,000 for December and a pro-rated amount of $9,225 for the first part of January 2007. Plaintiff did

10

not sign a release and instead filed the instant action on February 13, 2007. The White Oak Group informed its contact at the executive search firm that Plaintiff was terminated and that she had filed suit against the company.

### B. Contentions

Plaintiff contends that Defendant breached its contract with her by failing to pay her for a period of six months after the company terminated the Consulting Agreement. She further contends that Defendant has been stubbornly litigious and should pay attorney's fees pursuant to O.C.G.A. § 13-6-11. According to her amended motion for summary judgment, Plaintiff seeks $156,000 plus prejudgment interest at the rate of 1.5% per month from January 11, 2007 until the date of judgment, as well as attorney's fees and expenses.

Defendant responds that it did not breach the Consulting Agreement because the terms of the contract did not require it to give notice for termination. Further, Defendant counterclaims that Plaintiff breached her contract to the company because she did not work 40 hours per week as specified in the contract. Defendant also raises a cause of action of fraud due to Plaintiff's submission of invoices for December 2006 and January 2007 seeking full monthly payment when she did not work full time. In the alternative, Defendant raises a counterclaim under a theory of unjust enrichment. Defendant also seeks its attorney's fees and punitive damages.

11

The court finds that the parties' voluminous pleadings and cross-motions for summary judgment are a sufficient basis upon which the court can adjudicate the parties' claims and therefore DENIES Plaintiff's motion for oral argument [79].

## II.    Analysis

### A.    Preliminary Matters

Plaintiff filed a notice of objections to the declaration of Morgan McClure filed by Defendant.  Plaintiff contends that the declaration is improper because it was not disclosed in response to Interrogatory No. 12 propounded by Plaintiff.

As an initial matter, the court notes that both Plaintiff and Defendant listed Mr. McClure as a potential witness with knowledge of the facts of the case in their Initial Disclosures.  Moreover, the depositions of Mr. Melton and Mr. Mykityshyn both amply refer to the difficulties they believed Mr. McClure had in working with Plaintiff.  For reasons on which the court could only speculate, Plaintiff chose not to take the deposition of Mr. McClure.  There is nothing improper about Defendant's submission of a declaration of a witness listed on both its and Plaintiff's initial disclosures.

Further, Interrogatory No. 12 requests that Defendant "[d]escribe in reasonable detail the material facts" that relate to Defendant's counterclaims.  In response, Defendant answered that "Plaintiff is liable to it for actual and compensatory damages as a result of her failure to work the 40 hours per week as required by the Consulting Agreement and her

submission of invoices to Defendant in which she falsely represented that she had worked 40 hours per week as required by the Consulting Agreement." Plaintiff asserts that because Defendant did not refer to Mr. McClure in its answer to this interrogatory, Defendant should be barred from relying on his declaration.

The court notes that nothing in the interrogatory requests that Defendant outline the evidence in the record for which it relies; rather, the interrogatory simply asks for the "material facts" which relate to Defendant's counterclaims. The court finds that Defendant's answer sets forth in a sufficient manner the basis for Defendant's argument that Plaintiff breached the Consulting Agreement. For the foregoing reasons, the court will not strike the declaration of Mr. McClure.

**B.      Plaintiff's Breach of Contract Claim**

The elements of a breach of contract action are (1) a valid contract, (2) breach of that contract, and (3) damages caused by the breach. *Budget Rent-A-Car of Atlanta, Inc. v. Webb*, 220 Ga. App. 278, 279 (1996) (quoting *Graham Bros. Constr. Co. v. C.W. Matthews Contracting Co.*, 159 Ga. App. 546, 550 (1981)). Here, there is a valid contract (the Consulting Agreement), the operative paragraph of which provides:

> 2.      <u>Term and Termination</u>.  This Agreement shall be for a term of 6 months from the Effective Date, and shall be extended automatically (without further action of the Company or Consultant) each day for an additional day so that the remaining term shall continue to be 6 months; <u>provided</u>, <u>however</u>, that either party may at any time, by written notice to the other, fix the term of this agreement to a finite

13

> term of the 6 months, without further automatic extension, commencing with the date of such notice.

*See* Agreement, ¶ 2 (underlining in original).

The court does not find any ambiguity in this provision, although it is not artfully drawn.[1] The Agreement establishes June 1, 2006, as the "Effective Date." The Agreement provides a term of 6 months from the Effective Date, a term that is to be "extended automatically" on each day so that the "remaining term shall continue to be 6 months." The court finds this means that as of June 1, 2006, Plaintiff had a contract for six months until December 1, 2006; as of June 2, 2006, Plaintiff had a contract for six months until December 2, 2006; and so forth. The second half of the paragraph governs termination. The court interprets this provision to mean that either party without notice can set the limit of the contract to six months from the date of notice. Here, The White Oak Group gave written notice to Plaintiff on January 11, 2007, meaning that her contract was on that date fixed to a term of six months with no automatic extensions. Thus, Plaintiff is correct that she should have been paid under the contract for a period of six months from the date of January 11, 2007. The court disagrees that its interpretation entitles Plaintiff to a minimum guaranteed 12 months' salary. *See* Defendant's Motion for Summary Judgment, at 15. Rather, the

---

[1]Because the court does not find the provision ambiguous, the court need not address the parties' arguments about the extent to which Georgia law permits a reference to parole evidence to interpret an ambiguous contractual provision. Similarly, because the contract is not ambiguous, the court need not determine who "drafted" the contract as a means of construing any ambiguous provisions "against" the drafter.

14

contract continued for a rolling six-month period, and either party could terminate the contract by stopping the "rolling" nature of the six-month period. That is to say, The White Oak Group could have terminated Plaintiff's contract on June 2, 2006, with the conclusion of the contractual period being December 2, 2006, a time period that is less than twelve months.

The court notes that it is not clear that the crafting of this provision reflects both parties' intentions as to the length of the contractual relationship. In the e-mails leading up to the drafting of the Agreement, Plaintiff does refer to a "rolling" six-month term, and The White Oak Group's lawyer was apparently given the e-mails as a basis upon which to draft the contract. *See* Tura Depo., at 74 (e-mails were exchanged and Mr. Melton forwarded them to White Oak's attorney saying, "can you make sure these are incorporated"). However, from The White Oak Group's perspective, the company hired Plaintiff under a short-term consultancy agreement to "bridge the gap" to placing her as a Chief Financial Officer in an acquired company. There is no testimony to suggest that Mr. Melton or Mr. Mykityshyn intended to sign on to a contract that could potentially extend into a year's duration. But the parties' intentions are not relevant to a legal interpretation of an unambiguous contract provision when the contract contains a merger clause, as this one does. However, because intentions are relevant to the issue of attorney's fees pursuant to O.C.G.A. § 13-6-11, the court elaborates below.

AO 72A
(Rev.8/82)

## B.    Plaintiff's § 13-6-11 Claim

Plaintiff seeks attorney's fees pursuant to O.C.G.A. § 13-6-11 for the alleged bad faith and stubborn litigiousness on the part of Defendant.[2]  With regard to the bad faith prong, Georgia courts have stated:

> [b]ad faith warranting an award of attorney's fees must have arisen out of the transaction on which the cause of action is predicated.  It may be found in defendant's carrying out [of] the provisions of the contract, that is, how defendant acted in his dealing with the plaintiff.  Bad faith other than mere refusal to pay a just debt is sufficient, provided it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.

*Steel Magnolias Realty, LLC v. Bleakley*, 276 Ga. App. 155, 156 (2005) (quoting *Young v. A.L. Anthony Grading Co.*, 225 Ga. App. 592, 593 (1997)).  *See also Jordan Bridge Co., Inc. v. I.S. Bailey, Jr., Inc.*, 164 Ga. App. 124, 125-26 (1982) (breach of contract may provide a basis for attorney's fees if the breach is prompted by some "interested or sinister motive").


Recovery under the stubborn litigiousness prong "is authorized where the evidence reveals no bona fide controversy or dispute with respect to the defendant's liability." *Steel*

---

[2]O.C.G.A. § 13-6-11 provides:
The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.
*Id.*

AO 72A
(Rev.8/82)

*Magnolias Realty*, 276 Ga. App. at 157-58. "While issues of stubborn litigiousness are normally for the jury, if there is a bona fide controversy, there can be no stubborn litigiousness as a matter of law." *Trust Co. Bank of Augusta v. Henderson*, 185 Ga. App. 367, 372 (1987); *see also Edwards-Warren Tire Co. v. Coble*, 102 Ga. App. 106, 112 (1960) ("Where parties enter into a contract in good faith and there is a breach of the contract with no allegations or evidence to show bad faith, stubborn litigiousness, or unnecessary trouble and expense, the expenses of litigation will not be allowed.").

On the bad faith prong, there is no evidence in the record that Defendant acted with any "interested or sinister" motive in terminating Plaintiff's contract on January 11, 2007. While Plaintiff vehemently disagrees with Mr. McClure's assessment of her abilities and with Mr. Melton's view as to her attitude and failure to correct performance issues, there is nothing to show that any of Defendant's representatives did not believe their criticisms to be valid. Further, the fact that Defendant requested that Plaintiff sign a release prior to paying out on her final invoices is also not reflective of bad faith. Such a request is closer to the norm in the current state of employment relations. Defendant ultimately paid Plaintiff the amounts owed in her invoices even without a release.

The dispute as to what Plaintiff was owed at the time she was terminated can be considered under both the "bad faith" and "stubbornly litigious" prongs. The court has stated above that the plain language of the contract required Plaintiff be paid for a six-month

17

period after termination, and thus, Defendant's interpretation of the contract was incorrect. However, the only evidence in the record shows that in believing they could terminate Plaintiff on January 11, 2007 with no future payments, Messrs. Melton and Mykityshyn were relying on their honest recollections about what the parties intended at the inception of the consulting agreement. *See* Melton Depo., at 86 (testifying that he believed the contract to be for a term of six months); Mykityshyn Depo., at 139 (he was "shocked" when Plaintiff asked what she should do for the remaining six months of her contract when she was terminated).

There is no disagreement in the record that at the time Plaintiff and The White Oak Group came into contact with one another, it was contemplated that Plaintiff would be placed in a position as Chief Financial Officer of a company that The White Oak Group would acquire. Plaintiff's long-term employment would not be with The White Oak Group but rather with the acquired entity. Recognizing, however, that Plaintiff was taking a risk in leaving her prior employment and in turning down other offers of employment with existing companies, the Consulting Agreement was a short-term mechanism whereby the parties could assure Plaintiff of some defined amount of salary in the event that the acquisition fell through. Messrs. Melton and Mykityshyn's belief that Plaintiff's consulting contract had a term of six months and could thereafter be terminated at will by either party

is in line with these circumstances. While this parole evidence cannot create an ambiguity as to the terms of the contract, it is enough to defeat Plaintiff's claim for attorney's fees.

Because there was a bona fide controversy between the parties, the court finds that Plaintiff's O.C.G.A. § 13-6-11 claim fails as a matter of law. *See also Grange Mut. Cas. Co. v. Kay*, 264 Ga. App. 139, 144 (2003) (finding no liability where a bona fide controversy existed as to the terms of a settlement agreement); *Williams Tile & Marble Co. v. Ra-Lin & Assocs., Inc.*, 206 Ga. App. 750, 752-53 (1992) (holding that there must be sufficient evidence of defendant's bad faith in entering into contract in order for jury to consider claim under § 13-6-11 and holding "although there was ample evidence of appellant's *breach* of contract, there was insufficient evidence of appellant's *bad faith* in entering into the subcontract or its performance thereof").

Therefore, the court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for summary judgment [46]; and GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment on Plaintiff's claims [47]; and GRANTS IN PART AND DENIES IN PART Plaintiff's amended motion for summary judgment [60]. The contract provides that Plaintiff is to receive a salary of $26,000 per month. The court finds that this

19

amount should have been paid to Plaintiff for six months following the January 11, 2007

written termination of the contract, for a total of $156,000 in damages.

### C. Defendant's Counterclaims

Defendant's fraud claim alleges both that Plaintiff did not work 40 hours per week

for December 2006 and the first part of January 2007 despite her assertion to the contrary

in her invoices and that Plaintiff submitted an invoice for the entirety of January 2007 even

though she was terminated on January 10, 2007 and did no work for the company after that

date.

To the extent that Defendant's fraud claim alleges that Plaintiff presented to the

company an invoice for the full month of January 2007 while she only worked through

January 11, 2007, Defendant's claim fails for lack of damages. Defendant refused to pay

Plaintiff $26,000 for the entire month of January 2007 and paid her only $9,225 as pro rated

through January 11, 2007. Therefore, Defendant did not suffer damage due to any alleged

fraud on the part of Plaintiff to bill Defendant for the latter half of January 2007. Further,

the court notes that Plaintiff's description on her January 2007 invoice differs from that she

had placed on the previous invoices. For January, she described "For January Services per

our Consulting Agreement" rather than "for . . . services rendered" as on the previous

invoices. This likely reflects Plaintiff's belief that Defendant's January 2007 payment to her

was to be in accordance with Paragraph 2's termination provisions under the contract.

AO 72A
(Rev.8/82)

The court next considers Defendant's allegation that Plaintiff's December 2006 and January 2007 invoices were fraudulent because Plaintiff did not work a full 40 hours per week during that time period. To establish a claim for fraud, a plaintiff must show: (1) false representation by defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damage to the plaintiff. *See*, *e.g.*, *Bogle v. Bragg*, 248 Ga. App. 632, 634 (2001). For the purposes of the summary judgment motions, Plaintiff focuses on the justifiable reliance element.

To establish justifiable reliance, The White Oak Group, as plaintiff in counterclaim, must show that it "exercised due care to discover the fraud." *Id.* at 635-36. Here, according to the testimony of Messrs. Melton and Mykityshyn, The White Oak Group, in particular Mr. McClure, provided feedback in November 2006 as to concerns with Plaintiff's performance. According to Mr. Melton, this is why he had the November 28, 2006 phone call with Plaintiff. Mr. Melton also asked Mr. McClure to continue to monitor Plaintiff's performance and get back to him. Under these circumstances, the court finds that after November 2006, Defendant had plenty of reason to more closely analyze Plaintiff's invoices and raise questions if necessary. Defendant chose not to do so and for this reason, its fraud claim fails. *See also Moran v. NAV Services*, 189 Ga. App. 825 (1989) (quotation and

citation omitted) ("One cannot claim to be defrauded about a matter equally open to the observation of all parties where no special relation of trust or confidence exists.").[3]

Defendant's breach of contract claim alleges that Plaintiff submitted an invoice for December 2006 and the first part of January 2007, but did not work the 40 hours per week required under the contract for those periods. Plaintiff responds that Defendant's breach of contract claim is barred by the voluntary payment doctrine because Defendant paid Plaintiff's invoices for December 2006 and the first part of January 2007.

There is a dispute of fact as to whether Plaintiff worked for 40 hours per week in December 2006 and the first part of January 2007. Defendant's representatives testified that she did not. *See* McClure Decl., ¶ 17 ("there simply is no way that Ms. Tura could have been working forty (40) hours per week on behalf of the [White Oak Group] during the months of December 2006 and January 2007"); Melton Depo., at 118 (stating that the services she rendered to The White Oak Group were not equivalent to what she invoiced);

---

[3]Nor can The White Oak Group argue that it was engaged in a special relationship with Plaintiff that could vitiate the need for due diligence. The relationship between Plaintiff and Defendant here as consultant/company or even employee/employer does not rise to the level of a "confidential relationship" that might impose additional obligations. *See*, *e.g.*, *Physician Specialists in Anesthesia, P.C. v. Wildmon*, 238 Ga. App. 730 (1999) (citing *Cochran v. Murrah*, 235 Ga. 304, 307 (1975), for proposition that "relationship between an employer and its employee is not the type of relationship from which a confidential relationship will be implied as a matter of law" but may under particular circumstances); *Parello v. Maio*, 268 Ga. 852, 853 (1998) (the "mere circumstance that two people have come to repose a certain amount of trust and confidence in each other as the result of business dealings is not, in and of itself, sufficient to find the existence of a confidential relationship").

AO 72A
(Rev.8/82)

Mykityshyn Depo., at 139 (company considered her payment for December to be severance because she did not really work in December).

Plaintiff testified that her work far exceeded 40 hours per week, but that she did not keep any written records of her time. At her deposition, she testified, "I put in well over 40 hours per week for The White Oak Group especially when you consider the travel that I would do." *See* Tura Depo., at 137. When asked how she kept track of her time, Plaintiff responded: "Kind of like I do now, in my head. You know of know. Let's put it this way, I – I don't know that I ever worked eight hours days. I typically – I mean, in your head. You know what you work." *Id.* When asked how she accounted for days that she took off, Plaintiff said, "I kept track of it in my head. It was nothing for me to put in, you know, a 14 hour day." *Id.* at 138.

> Q:    So you would just keep track of everything in your head and at the end
>       of the month just generate your invoice?
> A:    Right.
> Q:    And your invoice was always for the $26,000, there was never a month
>       that it was less than that?
> A:    No.
> Q:    But there were months when you took vacation days or holidays that
>       –
> A:    Yes.
> Q:    And you invoiced the $26,000 for that month as well?[4]

---

[4]*Compare* Tura Depo., Exh. 31, e-mail from Kelly Tura to Wilson Lowery and Chris Melton, dated November 3, 2006 ("I am respectfully requesting a few days off on Monday, November 13 through Thursday, November 16. I of course will not charge the White Oak Group for days not worked and will accordingly adjust my monthly fee.") with Tura Depo., Exh. 32, November 2006 invoice charging full rate of $26,000.

23

> A: Yes, because I worked plenty of hours.
> Q: And again, that's just all in your head? That's all kept track of in your head, there's no way to verify it?
> A: Correct.

*Id.* at 140.

Ordinarily, such a dispute of fact would mean that a jury would have to determine whether Plaintiff had worked the 40 hours per week clearly required under the Consulting Agreement. However, Plaintiff alleges that Defendant's breach of contract claim is barred by the voluntary payment doctrine. Georgia courts apply the voluntary payment doctrine to breach of contract actions. *See*, *e.g.*, *Telescripps Cable Co. v. Welsh*, 247 Ga. App. 282 (2000); *Couch v. Blackwell & Assocs., Inc.*, 150 Ga. App. 739, 740 (1979); *Henson v. Columbus Bank & Trust Co.*, 144 Ga. App. 80 (1977).

The common law voluntary payment doctrine is codified at O.C.G.A. § 13-1-13 which provides:

> Payments of claims made through ignorance of the law or where all of the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule prescribed in this Code section.

*Id.* The plaintiff bears the burden of demonstrating that the voluntary payment doctrine does not apply. *See*, *e.g.*, *Cotton v. Med-Cor Health Info. Solutions, Inc.*, 221 Ga. App. 609, 611 (1996). Georgia courts do not require a plaintiff to have actual knowledge of all of the facts,

24

so long as the payer had constructive knowledge of the material facts. *See*, *e.g.*, *Fitzgerald Water, Light & Bond Comm'n v. Shaw Indus., Inc.*, 270 Ga. App. 68, 70 (2004) ("even though [defendant] claims that it lacked actual knowledge of the rates it was charged, it had 'the means of such knowledge' at its disposal"); *Liberty Nat'l Life Ins. Co. v. Radiotherapy of Georgia, P.C.*, 252 Ga. App. 543, 546-47 (2001) (voluntary payment doctrine applies "to one who pays by mistake without a valid reason for failing to ascertain the truth"); *Cotton*, 221 Ga. App. at 611 ("The party seeking recovery must prove that . . . certain material facts were not known at the time of payment or a valid reason existed for failure to determine the truth."); *White v. Rowland*, 67 Ga. 546, 557 (1881) ("[w]hen money is paid with a full knowledge of all the facts and circumstances upon which it is demanded, or with the means of such knowledge, it cannot be recovered back upon the ground that the party supposed he was bound in law to pay, when in truth he was not").

The court finds Mr. Mykityshyn's testimony relevant to a determination of whether any of the exceptions in § 13-1-13 apply to the situation here. In his deposition, Mr. Mykityshyn was asked:

> Q:  Did you discuss anything about severance with [Plaintiff during the January 10, 2007 meeting]?
>
> A:  Well, given the fact that she didn't really work for December and we paid her $26,000 anyway and expenses on top of that, and given the fact that, as evidenced by her current employment contact, she was dramatically overpaid for what we got; so yes, we were being really nice guys to let her keep the money that she took for not doing much in December and paying her expenses back. That was her severance.

> Q: My question was did you discuss severance with her?
> A: I don't recall.
> Q: Did you discuss anything about modifying the contract in any way?
> A: I do recall that there was an outstanding invoice that she had for December, which we said we were gonna go ahead and pay, and that there were expenses to some amount that we were going to pay as well and to invoice us for those.

*See* Mykityshyn Depo., at 139-40.

This testimony establishes that at the time Defendant instructed Plaintiff to submit an invoice for December 2006, Defendant believed that Plaintiff had not fulfilled her 40 hour per week obligation. Therefore, there could be no mistake of fact between the parties, nor could there be any "misplaced confidence, artifice, deception, or fraudulent practice" that occurred between Plaintiff and Defendant. Defendant believed that paying Plaintiff for December 2006 when she did not perform the work required under the contract would be a kind of "severance" for her. The court understands that Defendant's belief on this point is colored by its interpretation of the Consulting Agreement which the court has subsequently rejected. Nevertheless, the salient point for the purposes of the voluntary payment doctrine is that Plaintiff did not pull the wool over Defendant's eyes with the submission of the December 2006 and first part of January 2007 invoices. Defendant made a deliberate decision at the time to pay Plaintiff for those invoices despite Defendant's belief that Plaintiff had not completed the required work under the contract.

AO 72A
(Rev.8/82)

For these reasons, Defendant is not saved by the statute's exception for "misplaced confidence, artifice, deception, or fraudulent practice." Defendant is further not aided by *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400 (1986). In that case, on certification from the United States Court of Appeals for the Eleventh Circuit, the Supreme Court of Georgia read § 13-1-13 in conjunction with § 23-2-32(b) which provides that "relief may be granted even in cases of negligence by the complainant if it appears that the other party has not been prejudiced thereby" and held:

> In an action for money had and received, the plaintiff generally can recover a payment mistakenly made when that mistake was caused by his lack of diligence or his negligence in ascertaining the true facts and the other party would not be prejudiced by refunding the payment – subject to a weighing of the equities between the parties by the trier of fact.

*Id.* at 406. In *Folsom*, the plaintiff made payment under a mistake of fact due to a computer error. *Id.* at 400. *Folsom* goes on to state, "the issue of what is a valid reason for failing to ascertain the truth, is ordinarily a question for the jury." *Id.* at 404. Here, however, the court has determined that Defendant was not operating under any mistake of fact when it paid the December 2006 and first part of January 2007 invoice. A consideration of a plaintiff's negligence in failing to ascertain the true facts prior to payment is inapplicable to the circumstances of this case. The court finds, therefore, that Defendant's breach of contract counterclaim is barred by the voluntary payment doctrine.[5]

---

[5]Defendant pleads an unjust enrichment claim in the alternative to its breach of contract claim. While Defendant may plead in the alternative, now that the court has

Because the court has rejected Defendant's fraud, breach of contract, and unjust enrichment counterclaims, the court also finds Defendant's derivative claims of attorney's fees pursuant to O.C.G.A. § 13-6-11 and punitive damages to be without merit. Therefore, the court DENIES Defendant's motion for summary judgment on its counterclaims [48].

**D.      Materials Filed Under Seal**

The parties have filed voluminous documents under seal with the Clerk of the Court. The court recognizes that this litigation involves a private equity company and that subjects such as the funding of the company from outside sources, the stakes placed in the company by the managing partners, potential targets for acquisition, process of conducting due diligence, and other like matters are subjects The White Oak Group would prefer to keep private. The court also recognizes that the parties worked diligently to keep discovery flowing while trying to accommodate The White Oak Group's concerns about the disclosure of proprietary or strategically confidential information. However, at base, this is a breach of contract dispute in the employment context. The court's order has set forth the material facts of this dispute without the necessity of delving into sensitive subjects.

---

determined that the parties' relationship is governed by the Consulting Agreement, Defendant's claim for unjust enrichment cannot stand. *See Kwickie/Flash Foods, Inc. v. Lakeside Petroleum, Inc.*, 246 Ga. App. 729, 730 (2000) (recovery under a theory of unjust enrichment is not authorized when claim is based on express contract and parties have not repudiated contract); *Mabry v. Pelton*, 208 Ga. App. 891, 893 (1993) (theory of unjust enrichment applied where there is no legal contract).

Rather than clutter the record with a myriad of sealed documents, the filing of which severely burdens the maintenance of the record and could possibly leave the public with the perception the court has ruled on motions for summary judgment based on information that is under seal, the court DENIES all motions to seal. Specifically, the court DENIES Plaintiff's motion for leave to file under seal [45]; DENIES Defendant's motion to seal [49]; DENIES Defendant's motion to seal [52]; DENIES Defendant's motion for leave to manually file confidential documents under seal [54]; DENIES Defendant's motion to seal [55]; DENIES Plaintiff's motion to seal [63]; DENIES Plaintiff's motion to seal [69]; DENIES Defendant's amended motion to seal [73]; and DENIES Defendant's motion for leave to file documents under seal [77].

The Clerk of the Court is DIRECTED to inform the parties of the manner in which they may retrieve their sealed materials from the Clerk of the Court.

The court FURTHER DIRECTS the parties to re-file the following docket entries without sealing: [46, 51, 53, 56, 57, 64, 65, 66, 67, 68, 70, 75, 76, and 78]. The parties may redact confidential information in those pleadings as the court described above, but the parties may not redact any document in its entirety and may not file any documents under seal with the following caveat. The parties may continue to have the complete depositions and exhibits filed under seal. To the extent that the court has referred to any particular

AO 72A
(Rev.8/82)

deposition testimony in the above order, the parties must file those particular deposition excerpts as exhibits to their re-filed unsealed motions.

The court recognizes that this direction requires additional effort on behalf of the parties, and since the inception of this case, the court has updated its Revised Case Instructions to better manage the issue of sealing in the future. However, the court finds it of paramount importance to the public's view of the administration of justice that the docket not be burdened with inordinate amounts of sealed documents.

## III.    Conclusion

The court DENIES Plaintiff's motion for leave to file under seal [45]; GRANTS IN PART AND DENIES IN PART Plaintiff's motion for summary judgment [46]; GRANTS IN PART AND DENIES IN PART Defendant's motion for summary judgment on Plaintiff's claims [47]; DENIES Defendant's motion for summary judgment on its counterclaims [48]; DENIES Defendant's motion to seal [49]; DENIES Defendant's motion to seal [52]; DENIES Defendant's motion for leave to manually file confidential documents under seal [54]; DENIES Defendant's motion to seal [55]; GRANTS IN PART AND DENIES IN PART Plaintiff's amended motion for summary judgment [60]; DENIES Plaintiff's motion to seal [63]; DENIES Plaintiff's motion to seal [69]; DENIES Defendant's amended motion to seal [73]; DENIES Defendant's motion for leave to file documents under seal [77]; and DENIES Plaintiff's motion for oral argument [79].

Defendant is DIRECTED to PAY Plaintiff $156,000 plus pre-judgment interest from January 11, 2007 to the date of judgment.

The Clerk of the Court is DIRECTED to CLOSE this case.

**IT IS SO ORDERED** this 15th day of September 2008.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)